UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Craig Porubsky,

      Plaintiff,

v.                                    Case No.: 10-13591

Macomb Community College, Elizabeth Ness,     Honorable Sean F. Cox
and Ken Warnock.

      Defendants.

_____/

**OPINION & ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Craig Porubsky ("Plaintiff") brought this § 1983 action against Defendants,

Macomb Community College ("MCC"), Elizabeth Ness ("Ness"), and Ken Warnock

("Warnock") (collectively, "Defendants").  Plaintiff alleges various gender discrimination claims

arising out of Plaintiff's failing grade in the Clinical Phase of the MCC Surgical Technology

Program. The matter is currently before the Court on Defendants' Motion for Summary

Judgment. The parties have briefed the issues and the Court heard oral argument on June 28,

2012. For the reasons that follow, that the Court shall GRANT Defendants' Motion for Summary

Judgment.

**BACKGROUND**

On September 9, 2010, Plaintiff filed a Complaint asserting the following claims: Sex

Discrimination in Institution Receiving Federal Financial Assistance in Violation of 20 U.S.C. §

1681 (Count I); Depravation of Fourteenth Amendment Substantive Due Process Rights in

Violation of 42 U.S.C. § 1983 (Count II); Depravation of Fourteenth Amendment Procedural

Due Process Rights in Violation of 42 U.S.C. § 1983 (Count III); Depravation of Substantive

Due Process Rights under the Michigan Constitution (Count IV); Depravation of Procedural Due

Process Rights under the Michigan Constitution (Count V); Declaratory Relief (Count VI);

Violation of Fourteenth Amendment Equal Protection under 42 U.S.C. § 1983 (Count VII); Title

IX Retaliation (Count VIII); and Respondent Superior and/or Agency (Count IX).

After the close of discovery, Defendants filed the instant Motion for Summary Judgment

on March 1, 2012. (Def. Mtn., Doc. Entry No. 64). Both parties complied with the Court's

practice guidelines for motions for summary judgment such that: 1) along with Defendants'

Motion for Summary Judgment, Defendant filed a "Statement of Material Facts Not in Dispute"

("Def. Stmt."); and 2) along with Plaintiff's Response, Plaintiff filed a "Counter Statement of

Disputed Facts." ("Pl. Stmt.").

The following reflects the evidence submitted by the parties, taken in the light most

favorable to Plaintiff.

Plaintiff is a 37-year-old white male and former student at MCC. (Pl. Stmt. at 1).

Defendant Ness is the MCC Surgical Technology Program Coordinator. (Def. Stmt. at 3).

Defendant Warnock is an MCC Surgical Technology Program Adjunct Faculty Member. (*Id.*).

Between January and December of 2009, Plaintiff was enrolled in the MCC Surgical

Technology Program and completed both the Central Processing Distribution Technology and

didactic phase of the program. (Pl. Stmt. at 2). In the fall of 2009, Plaintiff received a failing

grade in the clinical phase of the program ("SURG 1200"). (*Id.*). SURG 1200 is one course in a

multi-semester program and is graded on a "pass/fail" basis. (Def. Stmt. at 3). The course

2

"focuses on training students in a classroom/laboratory setting to perform mock surgical procedures." (*Id.*). The main instructor for SURG 1200 is Ness, however, Warnock also worked with the class roughly three or four times, and worked personally with Plaintiff once. (Pl. Stmt. at 4).

Since the beginning of SURG 1200, Ness identified concerns with Plaintiff's performance in the course. (Def. Stmt. at 4). Plaintiff contends that these concerns were either unfounded or not different than those of female students in the class. (Pl. Stmt. at 4). Another male student in the class, Bill DeMonde, observed that Plaintiff performed "no worse than other female students in the class." (*Id.*). In October 2009, most students in the class were allowed to move on to their assigned clinical/hospital training. (Def. Stmt. at 4). Plaintiff and a small group of others were kept in the classroom/laboratory setting for extra practice and direct feedback from the instructors. (*Id.*).

On October 13, 2009, all students except Plaintiff were released to their clinical/hospital training. (*Id.*). On October 19, 2009, Plaintiff was placed on an "Academic Work Plan," which was meant to target areas of concern the instructors had for Plaintiff. (*Id.*).

Plaintiff contends that Ness would regularly criticize and reprimand Plaintiff for actions that female students also engaged in without reprimand, such as arriving to class late. (Pl. Stmt. at 5). DeMonde also observed female students engage such behavior without reprimand. (*Id.*).

On October 27, 2009, Ness released Plaintiff to the clinical/hospital setting at the Berry Surgical Center. (Def. Stmt. at 5). Once in the clinical setting, Surgical Technologists and Nurses ("Preceptors") evaluated Plaintiff's performance. (*Id.*). During the first portion of the clinical setting, Plaintiff received several level 2 ("Needs Improvement") in aseptic technique on his

preceptor evaluations. (*See* Evaluations, Def. Ex. L).  Plaintiff began to receive level 3 ("Meets

Standards") in aseptic technique toward the end of the class. (*See* Evaluations, Pl. Ex. 8).

Preceptor Cindy Sexton noted that Plaintiff did a "good job" on his December 15, 2009

evaluation, but also expressed concern to Ness about Plaintiff's technical competence in aseptic

technique. (Sexton Affidavit, Def. Ex. M).

On December 17, 2009, the last day of the semester, Ness assigned Warnock to observe

Plaintiff's performance during two surgical procedures. (Def. Stmt. at 6). Plaintiff did not know

Warnock would be present that day. (Pl. Stmt. at 7). Plaintiff admits that he performed poorly

during the second procedure because he was nervous and had difficulty concentrating with

Warnock watching him. (*Id.* at 8).

On December 18, 2009, Ness and Warnock informed Plaintiff that he had failed SURG

1200. (Def. Stmt. at 7). During this meeting, Warnock explained his observations of Plaintiff in

the clinical setting, discussed Plaintiff's shortcomings in aseptic technique, and explained that he

"could not in good conscience pass" Plaintiff. (*Id.*). There was no explicit discussion of gender

during this meeting. (*Id.*) Plaintiff was visibly upset and repeatedly told Defendants, "you can't

treat people this way." (Pl. Stmt. at 9). Plaintiff also added that two women in the class passed

despite having the same shortcomings that he allegedly possessed. (*Id.*). After the Associate

Dean was called in, Plaintiff left the meeting, but remained on campus, and reiterated once more

to Defendants, "you can't treat people this way." (Def. Stmt. at 8).

Plaintiff then initiated the MCC three-step grade appeal process. (*Id.*). On January 12,

2010, Plaintiff met with Ness and Warnock regarding the first step in the appeal process. (*Id.*)

Plaintiff was upset to see Warnock at the meeting, and Plaintiff expressed his dissatisfaction with

4

Ness and Warnock's evaluations of his performance. (Def. Stmt. at 10). After the meeting,
Plaintiff was told not to return to the clinical site. (*Id.*). Plaintiff then went to the Berry Center
and attempted to question administrator Jan Glovak, but she would not meet with Plaintiff. (*Id.*).
Plaintiff also contacted Sexton to inform her of Ness's evaluation of Plaintiff's performance.
(*Id.*).

The second step of the grade appeal process involved Plaintiff meeting with Associate
Dean Bernadette Pieczynski. (Def. Stmt. at 8).

The final step involved Plaintiff filing a grade appeal to the Academic Standards
Committee. (*Id.*). Plaintiff's petition did not explicitly mention gender discrimination nor
retaliation, but did note that Plaintiff failed despite receiving "comparable" evaluations to other
students in the class, which by the end of the class consisted of 15 females and 1 male. (Pl. Stmt.
at 9). Ultimately, the Academic Standards Committee denied Plaintiff's appeal. (*Id.*).

Additionally, Plaintiff sent a letter to the Academic Standards Committee accusing Ness
of "flagrant violations of academic standards" and "failure to follow the course syllabus." (Def.
Stmt. at 10). Plaintiff also referred to the Academic Standards Committee as a "Kangaroo
Institution." (*Id.*). Plaintiff also wrote a letter to MCC President James Jacobs in which he
accused Ness of "sabotage" and "reckless and disrespectful behavior." (*Id.*). On April 2, 2010,
Plaintiff sent the letters to Glovak at the Berry Center and accused Ness of "lying" about
performance evaluations conducted by Berry staff members. (*Id.* at 11).  Plaintiff did not
mention gender discrimination in any of these communications.

On April 12, 2010, in response to Plaintiff's circulation of disparaging information about
Ness, Ness contacted Dean of Student Services Susan Boyd, and upon Boyd's advice, Ness filed

a police report with MCC police. (Def. Stmt. at 12).

On April 14, 2010, Boyd wrote a letter to Plaintiff in which she discussed her concerns about Plaintiff's conduct. (*Id.*) The letter also informed Plaintiff that he was no longer enrolled in any courses at MCC and that he must meet with Boyd before reapplying to class. (*Id.*).

On April 19, 2010, Plaintiff received a phone call and letter from Captain Maxinoski of the MCC police informing Plaintiff that Plaintiff "had no business being on campus until he re-registered for class." (*Id.*).

On July 24, 2010, Plaintiff inadvertently sent out an email to all of his former classmates from SURG 1200 that demeaned and disparaged several students from the class. (Def. Stmt. at 11). According to Ness, many of Plaintiff's classmates construed Plaintiff's email as a "hitlist." (Ness Affidavit at 16).  Plaintiff, however, contends that he did not intend to send this email to everyone in the class, and that he feels badly about sending the email. (Pl. Stmt. at 12).

Plaintiff did not return to the MCC campus and has made no effort to re-enroll in the Surgical Technology Program or retake SURG 1200. (Def. Stmt. at 12).

## LEGAL STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admission on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Celotex v. Catrett*, 477

6

U.S. 317, 323 (1986). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). In deciding a motion for summary judgment, a court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. V. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## ANALYSIS

**I.      Plaintiff's Equal Protection Claim Under 42 U.S.C. § 1983**:

In Count VII of Plaintiff's Complaint, Plaintiff alleges that Defendants violated the Equal Protection clause of the Fourteenth Amendment.  The Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. In order to establish a violation of Equal Protection under 42 U.S.C. § 1983, a plaintiff must demonstrate: 1) a person; 2) acting under color of state law; 3) deprived him of a federal right. *Sperle v. Mich. Dep't of Corr.,* 297 F.3d 483, 490 (6th Cir. 2002). The Equal Protection Clause prohibits the state from making distinctions that burden a fundamental right, target a suspect class, or intentionally treat one class differently from others similarly situated without any rational basis for the difference. *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005).  This case does not involve the deprivation of a fundamental right, and Plaintiff is not a member of a suspected class.  Instead, Plaintiff's claims fall into the third category – that Defendants treated males differently than similarly situated females.  (Pl. Resp. at 8).

At the summary judgment stage, a plaintiff must adduce either direct or circumstantial

evidence to prevail on his discrimination claim. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). In this case, Plaintiff has not submitted direct evidence of discrimination, and thus must establish his claim upon circumstantial evidence.

Generally, courts analyze equal protection, disparate treatment claims under the three-part, *McDonnell Douglas* burden-shifting framework. *See Toth v. City of Toledo*, 2012 WL 1816160 at *3 (6th Cir. 2012). First, the plaintiff must establish a prima facie case of discrimination. Next, the defendant must offer evidence of a legitimate, nondiscriminatory reason for its action. If the defendant is able to establish a legitimate, nondiscriminatory reason for its action, the burden shifts to the plaintiff to prove that the defendant's reason is in fact a pretext for intentional discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

### A. Did Plaintiff establish a prima facie case for reverse discrimination?

In order to establish a prima facie discrimination claim in the context of education, a plaintiff must satisfy four elements: 1) the plaintiff is a member of a protected or suspect class; 2) the plaintiff was qualified to receive a passing grade in the class; 3) the plaintiff was denied a passing grade despite his qualifications; 4) other students of similar qualifications who were not members of the protected class received passing grades. *See generally McDonnell Douglas*, 411 U.S. at 802. A protected or suspect class is a group that has traditionally been discriminated against, such as a racial minority. *Id*.

In the case at hand, Plaintiff is a white male, and thus not a member of a protected class. Therefore, Plaintiff cannot establish a prima facie case for discrimination.

While Plaintiff is not a member of a protected class, Plaintiff may still proceed under a §

1983 claim if he can prove that he was subject to reverse discrimination. *Id.* Instead of demonstrating that the plaintiff is a member of a protected class, the plaintiff must show that the background circumstances of the case support the suspicion that the defendant is that "unusual [educational institution] that discriminates against the majority". *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir. 1985). After establishing this element, the plaintiff must then demonstrate that the educational institution treated differently students who were similarly situated but were not members of a protected class. *See generally Sutherland v. Michigan Dept. of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003).

### 1.    Did Plaintiff establish background circumstances to support the suspicion that Defendants discriminate against the majority?

Plaintiff does not cite to any direct evidence of gender discrimination by Defendants, such as disparaging remarks about his gender. Instead, Plaintiff relies on circumstantial evidence.

Relying on *Than v. RadioFree Asia*, 496 F. Supp 2d 38, 46 (D.D.C. 2007), Plaintiff argues that he has demonstrated that the background circumstances support the suspicion that Defendants have discriminated against him because "there is something 'fishy' about the facts of the case at hand that raises an inference of discrimination." (Pl. Resp. at 10) (emphasis added).

Plaintiff, however, has not cited any authority to suggest that the Sixth Circuit has adopted the "fishy standard." Instead, the proper analysis requires that the plaintiff demonstrate background circumstances that support the suspicion that the defendant discriminates against the majority. Such background circumstances can include a pattern or history of the defendant's actions that demonstrates discriminatory treatment against the majority. *See Zambetti v. Cuyahoga Community College*, 314 F.3d 249, 256 (6th Cir. 2002) (noting that past hiring

9

practices could establish sufficient background circumstances to show discrimination against the majority).  Courts have often held that if the person taking the adverse action against the Plaintiff is a member of the minority, this fact is sufficient to fulfill the background circumstances prong of the reverse discrimination test.  *See Id.*

While Plaintiff focuses on various facts and statistics related to the number of female and male students in the course, the fact that Elizabeth Ness, a female, made the decision to fail Plaintiff is sufficient to satisfy the background circumstances prong.  The Court notes, however, that despite Plaintiff's statements to the contrary, there does not appear to be a pattern of discriminatory treatment against men.  In fact, since MCC began offering SURG 1200, Plaintiff is the only male to have ever failed the course.  (Warnock Dep. at 185).

### 2.    Was Plaintiff qualified to receive a passing grade in SURG 1200?

The second prong of the prima facie test for reverse discrimination requires that the plaintiff be qualified to receive a passing grade in the course. *See Sutherland*, 344 F.3d at 614.

Here, there is dispute over whether Plaintiff was qualified to receive a passing grade in SURG 1200. Plaintiff contends that his preceptor evaluations indicate that he was qualified to pass the course.  (*See* Pl. Resp., Ex. 8).  Defendants argue that Plaintiff's preceptor evaluations and comments indicate that he was not qualified to pass the course.

Defendants contend that the preceptor's daily evaluations of the students are not consulted for grades because each student is evaluated by different preceptors in different clinical settings.  Defendants also state that Plaintiff was placed on an academic work plan on October 19, 2009 (Work Plan, Def. Mtn., Ex. I), and that Sexton, one of the Surgical Technologists who worked with Plaintiff in the clinical setting, became concerned with

Plaintiff's competence. (Sexton Affidavit, Def. Mtn., Ex. M). Additionally, Defendants point to Warnock's observations of Plaintiff's deficient performance in the clinical setting on December 17, 2009. (Warnock Affidavit, Def. Mtn. Ex. G).

While Plaintiff certainly did not have perfect scores on his evaluations that unequivocally indicate that he was qualified to pass SURG 1200, his evaluation scores do seem to be high enough to invite the possibility that Plaintiff was qualified for a passing grade. (*Id*.). Indeed, the great majority of Plaintiff's evaluation scores indicate that he "meets standards" or "exceeds standards" in the evaluation categories. Construing these facts in the light most favorable to Plaintiff, Plaintiff has established enough evidence to demonstrate that he was qualified to receive a passing grade in SURG 1200.

### 3.   Was Plaintiff considered for and denied a passing grade in SURG 1200?

The third prong of the prima facie test for reverse discrimination requires that the plaintiff to have been considered for and denied a passing grade in the course he failed. *See Sutherland*, 344 F.3d at 614. Here, there is no dispute that Plaintiff failed SURG 1200. Therefore, Plaintiff satisfies the third prong of the test.

### 4.   Did Plaintiff establish that Defendants treated differently students who were similarly situated but were not members of a protected class?

The final prong of the prima facie test for reverse discrimination requires that a plaintiff demonstrate that other students of similar qualifications who were not members of the protected class received passing grades in the class. *See generally Sutherland*, 344 F.3d at 614. A plaintiff must prove that *all* of the relevant aspects of his educational situation are "nearly identical" to those of his fellow students who he argues were treated more favorably. *See Pierce v.*

11

*Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994).

Plaintiff contends that he was treated differently than female students in SURG 1200. Plaintiff argues that his clinical evaluations were the same or better than other females in the course. (Pl. Resp. at 12). Also, Plaintiff asserts that he was subject to a different grading standard than the females of the class because Defendant Ness did not visit Plaintiff at his clinical site until the last day of the semester, thereby leaving Plaintiff no chance to rectify any problems he may have been having. (*Id.*). Plaintiff further states that Ness completed the final evaluations of the female students on December 15, 2009, but waited until after Warnock performed a clinical review of Plaintiff on December 17, 2009 in order to complete Plaintiff's final (failing) evaluation. (Final Evaluations, Pl. Resp, Ex. 5). Finally, Plaintiff contends that his final score was twice as low as any other student in the class, thereby raising suspicion and an "inference of discrimination." (*Id.* at 13).

As part of this fourth prong of the analysis, Plaintiff must demonstrate that all of the relevant and material aspects of his educational situation are "nearly identical" to females in the class. *See Pierce*, 40 F.3d at 802. Every student in SURG 1200 underwent on an on-site, clinical review. Plaintiff admits to performing poorly during his clinical review conducted by Warnock. It is clear that Warnock's observations of Plaintiff during this clinical review were a major factor in Ness's decision to fail Plaintiff. Additionally, prior to Plaintiff's clinical review, Sexton notified Ness of his poor performance in the clinical portion of SURG 1200. Thus, Plaintiff must show that other students also performed poorly in their clinical setting, yet, unlike Plaintiff, received passing grades from Ness.

Plaintiff provided the clinical evaluations of "Female #6" and "Female #7," which,

Plaintiff argues, establishes that he performed as well or better than these females. (Pl. Ex. 15). There are several problems with this approach. First, these females do not have "nearly identical" scores as Plaintiff. The scores on these evaluations range from "2s" to "4s," with most of the scores being 3s and 4s; some of these evaluations are completely devoid of scores. (*Id.*). More importantly, these evaluations were done by different preceptors than the ones Plaintiff had, and thus it is improper to compare the evaluations of one preceptor to another. (*Id.*). For example, some preceptors may be harsher graders than others, and a "3" for one preceptor may be a "2" for another preceptor. Therefore, comparing preceptor evaluations does not establish that all relevant aspects of Plaintiff's educational situation are "nearly identical" to females in the class.  Plaintiff does not provide any additional evidence that female students also performed poorly during their clinical review, but received a passing score from Ness.  In fact, Defendants report that none of the female students performed poorly.

Next, Plaintiff's contention that Defendant Ness ignored Plaintiff and did not give Plaintiff the kind of attention other female students received has no real foundation in the facts. Plaintiff did not actually observe any other female student during their clinical phases, and thus Plaintiff has no way of knowing how female students in the class were actually performing. Ness's deposition indicates that she remembers visiting all of the students at least once at their clinical site, but that she does not recall exactly when each visit was and what was discussed at each visit. (Ness Dep., Pl. Ex. 10 at 72-80). What is known is that Plaintiff was the last student Ness or Warnock visited and that he performed poorly. (*Id.*).

Finally, Plaintiff fails to explain how the one male in his class that did pass SURG 1200 factors into his gender discrimination claim. According to the final evaluations of the course,

there was one male that did pass the course. (Pl. Ex. 5). This male student had a final score that was similar to the females that passed the course. (*Id.*). Plaintiff makes no mention of this student in his complaint. The other two males that did not complete SURG 1200 along with Plaintiff voluntarily dropped the course. One of the males, Michael Hansen, withdrew after missing several clinical sessions, and made no mention of gender being an issue. (Henson Dep., Def. Ex. AA at 76-80). The other male, Bill Demonde, dropped the course for various reasons, but testifed that Defendant Ness treated females more favorably than males in SURG 1200. Plaintiff, however, fails to address the fact that he is the only male student that has ever failed the course.

Even in construing all the facts in a light most favorable to Plaintiff, Plaintiff has not sufficiently established that he was treated differently than similarly-situated females in his class. Because Plaintiff's clinical evaluations are distinct from his female counterparts in scoring and because he was evaluated by different preceptors, it is difficult to determine whether Plaintiff performed the same or better than certain females in the course. Additionally, as only one factor of the overall grading scale, Plaintiff's clinical evaluations are not indicative of his overall competence. Likewise, Plaintiff cannot simply look at his female counterparts' evaluations and draw conclusions as to their competence. Most importantly, Plaintiff has not submitted evidence that other female students who passed the course also performed poorly during their live, clinical evaluations by Ness or Warnock.

Because Plaintiff has not established a prima facie case of reverse discrimination, the Court need not proceed with the burden-shifting analysis.

## II.     Plaintiff's Title IX Gender Discrimination Claim Under 20 U.S.C. § 1681:

Title IX provides that "no person in the United States shall, on the basis of sex, be

excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a). Under Title IX, a recipient of federal funds may be liable in damages only for its own misconduct. *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 640 (1999). The recipient's misconduct must have excluded a person from participation in, denied a person the benefits of, or subjected a person to discrimination under its programs or activities. *Id.* at 640-41.

To establish liability under Title IX, a recipient of federal funds must: 1) have discriminated based on gender; 2) have notice or knowledge of the discrimination; and 3) the response to the discrimination "must amount to deliberate indifference to discrimination." *Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 290 (1989); *see Davis*, 526 U.S. at 633.

Plaintiff urges this Court to adopt the Title VII framework to analyze his Title IX claim, and ignore two major cases dealing with Title IX claims: *Davis* and *Gebser*.  In a case such as this, in which a plaintiff is claiming disparate treatment based upon his gender, the two standards are not mutually exclusive.  The Court must apply the *Davis*/*Gebser* standard to analyze Plaintiff's Title IX claim because Congress intended for private damages actions [under Title IX] to be brought only "where recipients of federal funding had adequate notice that they could be liable for the conduct at issue." *Davis*, 526 U.S. at 640.  However, in order to establish the first prong of the *Davis* test – that the recipient of federal funding discriminated based on gender – this Court must apply the traditional Title VII analysis for gender discrimination.  *See Nelson v. Christian Bros. University*, 226 Fed.Appx. 448, 454 (6th Cir. 2007) ("Generally, courts have looked to Title VII, 42 U.S.C. §§ 2000e, as an analog for the legal standards in both Title IX

15

discrimination and retaliation claims.").

In any event, the Court finds that Plaintiff's Title IX claim fails under both standards. As stated in Part I, above, Plaintiff's claim fails under the *McDonnell Douglas* burden-shifting framework because Plaintiff cannot establish that he was treated differently than similarly-situated female students. If Plaintiff survived an analysis under Title VII, Plaintiff would still have to prove that Defendant MCC had knowledge of the alleged discrimination and responded with deliberate indifference to the misconduct. *See Phillips v. Anderson County Bd. of Educ.*, 259 Fed. Appx. 842, 846 (6th Cir. 2008). Therefore, the Title XI analysis still controls.

Even if Plaintiff could establish that Defendants Ness and Warnock discriminated against him based on his gender, Plaintiff has failed to establish that MCC, the recipient of federal funds in this case, had knowledge of the discrimination against Plaintiff and acted with deliberate indifference to the discrimination. Plaintiff was enrolled in the Surgical Technology program at MCC from January 2009 until December 2009, and not once during that time period did Plaintiff suggest to his instructors or his preceptors that he was being discriminated against based on his gender. (Def. Ex. A at 100-07). Additionally, when Plaintiff met with Ness and Warnock to discuss his failing grade, there was no discussion of gender during the meeting. (Def. Ex. A at 220-23). Furthermore, Plaintiff failed to mention in his Academic Standards Committee Student Petition Form anything about him being discriminated against based on his gender. (Pl. Ex. 31). Finally, Plaintiff made no mention of gender discrimination in the letters he sent to the Academic Standards Committee, (Def. Ex. S), and to MCC President, James Jacobs. (Def. Ex. T). Indeed, the first time Plaintiff mentioned gender discrimination was in his Complaint before this court.

Plaintiff contends that the December 18, 2009 meeting he had with Defendants Ness and

Warnock establishes the starting point of when Defendant MCC knew of the discrimination against Plaintiff. Also, Plaintiff argues that his December 23, 2009 meeting with Associate Dean Pierczynski in which Plaintiff says "[Ness and Warnock] chose to treat me differently" put Defendant MCC on notice of the discrimination. Plaintiff argues that this statement, in conjunction with the course's gender demographics was enough to establish that Defendant MCC knew that Plaintiff experienced gender discrimination.

This argument falls short because Plaintiff simply assumes that MCC knew that Plaintiff was eluding to gender discrimination when he told Dean Pierczynsski that he was treated differently. In viewing the evidence in a light most favorable to Plaintiff, Plaintiff has not established that MCC had knowledge of gender discrimination against Plaintiff, or that it acted with deliberate indifference toward such discrimination. Thus, Plaintiff has failed to establish that he suffered gender discrimination under Title IX.

## III.    Plaintiff's Title IX Retaliation Claim:

Plaintiff also contends that Defendants retaliated against him by banning him from campus for engaging "in protected opposition to Title IX by pursuing an appeal of his grade." (Pl. Resp. at 28).

In order to prevail under a Title IX Retaliation claim, a plaintiff must prove: 1) that he engaged in a protected activity to Title IX discrimination; 2) that this exercise of his protected civil rights was known to defendant; 3) that defendant thereafter took an action adverse to the plaintiff subsequent to or contemporaneous with the protected activity; and 4) that there was a causal connection between the protected activity and adverse action. *Weaver v. Ohio State Univ.*, 71 F. Supp. 2d. 789, 793 (S.D. Ohio 1998); *see also Canitia v. Yellow Freight System, Inc.*, 903

F.2d 1064, 1066 (6th Cir. 1990). "Complaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity." *Weaver*, 71 F. Supp. 2d. at 793-94 (citing *Barber v. CSX Distribution Servs.*, 68 F.3d 694 (3d Cir. 1995)).

Like Plaintiff's Title IX discrimination claim, Plaintiff's Title IX retaliation claim fails because he never actually provided notice to MCC of the alleged gender discrimination prior to filing his Complaint. While it is true that Plaintiff mentioned to Dean Pierczynski that Ness and Warnock treated him differently than other students, Plaintiff never actually states that he was discriminated against based on his gender. Without mentioning gender discrimination at any time before his Complaint, Plaintiff cannot establish the causal link necessary to tie Defendants' adverse actions against him to his alleged protected activity (i.e. Plaintiff's grade appeal).

This case is similar to *Weaver*, in which the plaintiff only complained about the condition of the women's field hockey practice field, but neglected to relate the condition of the field to Title IX sex discrimination. *Weaver*, 71 F. Supp. 2d. at 793. The court in *Weaver* found that the plaintiff's complaints about the field conditions were not framed in terms of Title IX sex discrimination, and therefore her complaints could not be considered "protected activity." *Id.*

Similarly, here, Plaintiff's petition for a grade appeal makes no mention of gender discrimination, (Pl. Resp., Ex. 31), nor did any of the meetings or correspondences that Plaintiff had with his former preceptors and MCC administrators mention any gender discrimination. Just as the plaintiff in *Weaver* could not be considered to have engaged in protected activity because she failed to express her complaints specifically in terms of Title IX sex discrimination, here too, Plaintiff cannot be considered to have engaged in protected activity because he has failed to demonstrate that his grade appeal or his meetings with former preceptors was specifically related

18

to a gender discrimination incident.

There must be some sort of causal link between the protected activity and the adverse action.  Plaintiff has failed to establish that connection. Plaintiff has therefore failed to establish a prima facie case for retaliation under Title IX.

**IV.    Plaintiff's Federal and State Due Process Claims:**

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1. Michigan's Due Process Clause is not construed any differently than the federal guarantee. *See Saxon v. Dep't of Social Services*, 191 Mich. App. 689, 698 (1991).  Accordingly, Plaintiff's Federal and State Due Process claims rise and fall together.

**A.    Has Plaintiff established a violation of his procedural due process?**

Procedural due process requires that the state "provide a person with notice and an opportunity to be heard before depriving that person of a property or liberty interest." *Warren v. City of Athens*, 411 F.3d 697, 708 (6th Cir. 2005). The Court applies a two-step analysis for procedural due process claims: 1) the Court must determine whether a protected interest exists; and 2) the Court must determine what procedures are required to protect that interest. *Springfield v. Akron Metropolitan Housing Authority*, 289 F.3d 555, 565 (6th Cir. 2004). Additionally, in the academic setting, courts have found that due process requires that: 1) the student be informed of their academic situation; and 2) the decision must be careful and deliberate. *Board of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 85 (1978).

Protected interests are created and defined by sources independent of the Constitution, such as state law. *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). A few

district courts within the Sixth Circuit seem to have found a protected interest in continuing

education. *See Picozzi v. Sandalow*, 623 F. Supp. 1571, 1576 (E.D. Mich. 1986) (J. Feikens) ("A

public university student has a protected interest in continuing his studies."); *see also Hart v.

Ferris State College*, 557 F. Supp. 1379, 1382 (W.D. Mich. 1983). However, neither the Sixth

Circuit Court of Appeals nor the Supreme Court of the United States has recognized a protected

interest in continuing education. *See Regents of the Univ. of Michigan v. Ewing*, 474 U.S. 214,

223 (1985); *McGee v. Schoolcraft Community College*, 167 F. Appx. 429, 437 (6th Cir. 2006).

     In the present case, Plaintiff contends that his procedural due process was violated when

he was failed from SURG 1200 and then was "constructively" expelled from MCC's campus.

Relying on *Picozzi* and *Hart*, Plaintiff argues that he had a protected interest in his continued

education.  However, as mentioned above, neither the Sixth Circuit nor the Supreme Court has

recognized a protected interest in continuing education.

     Even if this Court applies the holdings in *Picozzi* and *Hart*, the case at hand is easily

distinguished from those cases. In *Picozzi*, the court found that the plaintiff was deprived of a

protected interest because the plaintiff was not permitted to re-enroll in law school until he

submitted to a polygraph test regarding his involvement in a dormitory fire. *Picozzi*, 623 F.

Supp. at 1576. In that case, the plaintiff was not afforded a hearing to challenge the requirement

that he submit to a polygraph test. *Id.* Further, the plaintiff's good academic standing had been

ruined by not being allowed to enroll in classes, and it was impossible for him to re-enroll at any

other law school due to his poor academic standing, effectively ending his legal education. *Id.*

     Unlike the plaintiff in *Picozzi*, Plaintiff in this case was given the opportunity to re-enroll

in classes at MCC, but he chose not to re-enroll. (Porubski Dep., Def. Ex. A at 369). Plaintiff

20

could have continued his education at MCC provided that he spoke with Susan Boyd, Dean of Success, before re-enrolling. (Porubski Dep., Def. Ex. A at 369). Additionally, there is nothing to suggest that Plaintiff is barred from enrolling at other schools due to poor academic standing, thereby further distinguishing this case from *Picozzi*.

The case at hand is also distinguished from *Hart*. In *Hart*, the plaintiff was faced with the threat of expulsion, and the court recognized that this threat was substantial enough to affect the plaintiff's due process rights. *Hart*, 557 F. Supp. at 1382. Here, MCC did not threaten to expel Plaintiff. Rather, Plaintiff failed SURG 1200 and was permitted to re-enroll in classes at MCC provided that he first speak with Dean Boyd. (Porubski Dep., Def. Ex. A at 369).

Additionally, both the *Picozzi* and *Hart* courts reiterate that as part of a student's procedural due process rights, the student must be given sufficient notice of the action pending against him and be afforded a fair hearing on the matter. *See Picozzi*, 623 F. Supp. at 1578; *Hart*, 557 F. Supp. at 1382-83. Here, Plaintiff was placed on notice of his failure of SURG 1200 by Ness and Warnock, and was afforded a proper hearing via the grade appeal process set forth by MCC. The grade appeal process requires that the student: 1) meet with the faculty member who provided the grade; 2) meet with the Associate Dean; and 3) file a petition with the Academic Standards Committee. Plaintiff met with Ness and Warnock on December 18, 2009, and Warnock explained what he believed to be critical breakdowns in Plaintiff's aseptic technique but never mentioned Plaintiff's gender. (Porubski Dep., Def. Ex. A at 220-23). Plaintiff then met with Associate Dean for Health and Human Services, Bernadette Pierczynski, regarding his failing grade. Plaintiff also filed a Student Petition Form with the Academic Standards Committee to challenge his grade, but makes no mention of gender discrimination in this

21

petition. (Pl. Ex. 31). The Academic Standards Committee reviewed and subsequently denied

Plaintiff's grade appeal. (Def. Ex. Q). The grade appeal process conforms with the notice

requirement and hearing/review requirement used by the courts in *Picozzi* and *Hart*.

Plaintiff also contends that the decision to fail him was not careful and deliberate because

Ness "waited until 2 days before the course ended to evaluate [Plaintiff's] progress." (Pl. Resp.

at 29). However, this assumes that Ness's evaluation of Plaintiff was the only criterion upon

which Plaintiff was failed. In determining that Plaintiff was not qualified to pass SURG 1200,

Defendants relied on Plaintiff's clinical evaluations, preceptors comments, and Ness and

Warnock's personal observations of Plaintiff.  Additionally, the decision was reviewed by the

Academic Standards Committee, which determined that Plaintiff's failing grade was warranted.

(Def. Ex. Q). As such, Defendants' decision to fail Plaintiff was careful and deliberate.

Therefore, even if Plaintiff had a protected interest in continuing education, Plaintiff's

procedural due process claim would still fail because Defendant MCC provided Plaintiff with a

procedure – the grade appeal process – to protect that interest, and the decision to fail Plaintiff

was careful and deliberate.

Finally, Plaintiff was neither "constructively" expelled nor was he "banished" from

MCC's campus. Plaintiff was simply told that unless he spoke with Dean Boyd about re-

enrolling in classes, he was no longer a student at MCC, and therefore no longer had a reason to

be on campus. (Def. Ex. A at 369-70). Plaintiff himself acknowledged in his deposition that he

had no business on MCC's campus after he failed SURG 1200. (*Id.* at 370). Additionally, the

"banishment letters" that Plaintiff cites merely point out what MCC identified as violations of

school policies by Plaintiff. (Pl. Ex. 28). Even if these were actually banishment letters, these

letters provided Plaintiff with a means of challenging his alleged banishment by giving Plaintiff the opportunity to schedule a hearing to rebut MCC's claims. (*Id.*). This hearing was in addition to the meeting that Plaintiff could have scheduled with Dean Boyd regarding his re-enrollment in classes at MCC. Therefore, Plaintiff was not "constructively" expelled or banished from MCC's campus because he was given an opportunity to be heard on his complaints and simply chose not to pursue that option.

Overall, Plaintiff was afforded a number of procedures through which to challenge his grade in SURG 1200 and continue his education at MCC. Viewing the evidence in a light most favorable to Plaintiff, Plaintiff has failed to establish that Defendants violated his procedural due process rights.

**B.      Has Plaintiff established a violation of his substantive due process?**

Substantive Due Process claims require that the plaintiff establish a "constitutionally protected life, liberty, or property interest." *McGee v. Schoolcraft Community College*, Fed. Appx. 429, 438 (6th Cir. 2006). Substantive due process rights are created only by the United States Constitution. *Sutton v. Cleveland Bd. of Education*, 958 F.2d 1339, 1351 (6th Cir. 1992). The Supreme Court has recognized that when a court reviews "genuinely academic decisions," that court "should show great respect for the faculty's professional judgment," and the court may not override the decision "unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Regents of the Univ. of Michigan v. Ewing*, 474 U.S. 214, 225 (1985).

Plaintiff contends that Defendants violated his equal protection rights and treated him differently than his female classmates, which constitutes a departure from accepted academic

norms. (Pl. Resp. at 30). As stated above, however, Plaintiff has failed to establish that

Defendants treated him differently than his female classmates based on his gender. Accordingly,

Plaintiff has failed present sufficient evidence to establish that Defendants have violated his

substantive due process.

**CONCLUSION**

For the reasons stated above, **IT IS HEREBY ORDERED** that Defendants' Motion for

Summary Judgment (Doc. Entry No. 64) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Complaint is **DISMISSED WITH**

**PREJUDICE**.

**IT IS SO ORDERED.**

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  July 10, 2012

I hereby certify that a copy of the foregoing document was served upon counsel of record on July
10, 2012, by electronic and/or ordinary mail.

S/Jennifer Hernandez
Case Manager